# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF KANSAS

SCHLUMBERGER TECHNOLOGY
CORPORATION,

*Plaintiff*,

vs.

Case No. 07-2252-EFM

GREENWICH METALS, INC.,

*Defendant*.

## MEMORANDUM AND ORDER

This case involves a dispute over allegedly defective lead. Plaintiff Schlumberger Technology Corporation ("Schlumberger") and Defendant Greenwich Metals, Inc. ("Greenwich") contracted for the sale of 1,200 metric tons of lead. After Schlumberger received the first shipment, it experienced problems in its production line. Schlumberger ultimately rejected the lead, and Greenwich retrieved the lead already delivered and did not deliver any more lead.

Schlumberger brings suit alleging that Greenwich failed to refund the money Schlumberger paid for the defective lead. Greenwich counterclaims alleging that Schlumberger wrongfully rejected the lead. Before the Court is Defendant Greenwich's Motion for Partial Summary Judgment asking the Court to determine that Defendant's Terms and Conditions govern the contract (Doc.69). Also before the Court is Plaintiff Schlumberger's Motion for Summary Judgment on Defendant's Counterclaim and on the applicability of Plaintiff's Terms and Conditions (Doc. 102). The motions

have been fully briefed. For the following reasons, the Court denies Defendant's motion and denies in part and grants in part Plaintiff's motion.

**I. Factual Background**

Schlumberger is a Texas corporation and has a manufacturing facility in Lawrence, Kansas. It manufactures products for use in the oil and gas industry, including lead-coated cable, for use in oil wells. Greenwich is incorporated in Connecticut and is an international trading company specializing in non-ferrous metals, including lead. Debby Roberts is Schlumberger's Procurement Specialist/Purchasing Coordinator at its Lawrence, Kansas facility and is responsible for purchasing raw materials, including lead, for Schlumberger. Peter Appleby is Greenwich's owner and founder.

On May 10, 2006, Appleby called Roberts at Schlumberger, introduced himself and Greenwich as a potential supplier of lead, and discussed whether Greenwich could provide lead meeting Schlumberger's requirements. After additional discussions and communications between Appleby and Roberts, they spoke over the phone on May 26, 2006. During this phone call, Appleby and Roberts agreed that Schlumberger would purchase from Greenwich 1,200 metric tons of copper-bearing lead that met Schlumberger's specifications and other requirements. They discussed and agreed on, among other things, the price, delivery, and shipment.

On May 26, 2006, after the telephone conversation, Appleby sent Roberts an email in which he stated that "[w]e are most pleased to confirm having sold you 1,200 mts (about 60 truckloads) of copper bearing Lead in accordance with the following terms and conditions." The email identified the quantity as "60 truckloads of about 44,000 lbs each;" the price as the "LME[1] cash settlement price for Lead averaged during the month of scheduled shipment plus a premium of

---
[1]LME stands for London Metal Exchange.

13¢lb;" the shipment as "20 truckloads per month, July through September, 2006;" and the delivery to Schlumberger's plant in Lawrence, Kansas. The email also stated that Greenwich would "issue three formal contacts [sic] . . . corresponding to each month of scheduled delivery and corresponding to your PO numbers . . . ."

On May 26, 2006, Appleby also sent a formal letter "confirming our sale of 1,200 mts of copper bearing Lead" and enclosed the three sales contracts, one for each month of scheduled shipment, to Schlumberger. Each sales contract contained the material, quantity, pricing, shipment, delivery, packing, payment terms, and comments. With regard to the price terms and shipment, the language in each sales contract stated:

> Pricing: Average LME lead cash settlement for July, 2006 plus premium of 13 cents/lb.
> Shipment: July 2006
>
> Pricing: Average LME lead cash settlement for August, 2006 plus premium of 13 cents/lb.
> Shipment: August 2006
>
> Pricing: Average LME lead cash settlement for September, 2006 plus premium of 13 cents/lb.
> Shipment: September 2006

Each sales contract also stated under the "comments" section that "the standard terms and conditions on the reverse side hereof are part of the contract." Schlumberger never signed the sales contracts.

On June 5, 2006, Roberts forwarded three executed purchase orders to Greenwich. Each of Schlumberger's purchase orders consisted of one page, and there was no other information on the back of the order. At the bottom of the front page, it provided:

> By accepting this purchases [sic] order supplier agrees to and acknowledges receipt of, Terms and Conditions, Schlumberger part number S-289901, which is incorporated in this purchase order. Additional copies of Schlumberger part number

S-288901 may be obtained from the buyer signing this purchase order. If order submitted by Buyer is unpriced or marked "Advise," Seller shall advise Buyer and this order shall be subject to buyers written approval of the price so submitted by Seller. Seller shall furnish the item listed above upon the terms and conditions and pursuant to the instructions on the front and the back hereof, which together with such drawings and specifications submitted by Buyer, if any, shall, upon your acceptance of this order constitute the full and complete contract of the parties.

Schlumberger's purchase orders included an almost verbatim copy of the price term from Greenwich's sales contracts:

Pricing on purchase order is an estimate. It will be based on the LME average cash settlement for July plus $0.13/lb. premium.

Pricing on purchase order is an estimate. It will be based on the LME average cash settlement for August plus $0.13/lb. premium.

Pricing on purchase order is an estimate. It will be based on the LME average cash settlement for September plus $0.13/lb. premium.

On June 5, 2006, after receiving and reviewing Schlumberger's purchase orders, Appleby acknowledged his acceptance of them:

Hi Debby,

Many thanks for getting us these three PO so quickly. I really appreciate your taking care of it. All seems in order although the latest delivery dates maybe a little too ambitious. The July order show 7/14 and the September order actually shows 7/8. No need to make any changes; just don't hold our feet to the fire.

As I advised earlier, production will start this week but we are holding back shipment until you receive and test the sample buttons. Once you accept the sample buttons, we will arrange prompt shipment, and deliveries can commence as soon as the railcars arrive from Canada.

Nobody at Greenwich signed the purchase orders.

Beginning on July 25, 2006, Greenwich began shipping to Schlumberger lead Greenwich had previously purchased from Falconbridge, a third-party mining company based in Canada. For

the initial deliveries, Schlumberger paid Greenwich a total of $429,129.60. Shortly after Schlumberger started using the lead Greenwich delivered, Schlumberger encountered problems with it in its manufacturing process. On August 10, 2006, Schlumberger notified Greenwich of the problems and instructed Greenwich to stop all deliveries. During the first week of September 2006, Appleby sent an email to Roberts which stated: "Confirming our telephone of last week, we have agreed to cancel pricing for September and suspend further pricing until the current quality issue is resolved." Schlumberger rejected the lead sometime between November of 2006 and January of 2007, and Greenwich retrieved the unused lead in November or December 2006. Greenwich did not return the $429,129.60 to Schlumberger.

The cash settlement price for lead on the LME was: $1,052.38 per metric ton in July, 2006; $1,174.14 per metric ton in August, 2006; and $1,342.38 per metric ton in September, 2006. Schlumberger was supposed to receive 400 metric tons each month. This means that Schlumberger would pay: $420,952 in July; $469,656 in August, and $536,952 in September.[2] In addition, Schlumberger was going to pay an additional 13 cents per pound which results in $114,640.34 each month. Had the lead been delivered to Schlumberger during the scheduled delivery months, the resulting contract price would have been: $535,592.34 in July; $584,296.34 in August; and $651,592.34 in September resulting in a total contract price of $1,771,471.02.

Beginning in September 2006, the LME price for lead began to increase, and by May 2007, the LME cash settlement price for lead had doubled the price in July 2006. By August 2007, the LME cash settlement price for lead had tripled the price in July 2006. From July to November 2007 and February to March 2008, the LME cash settlement price for lead remained at or near triple the

---

[2]The Court will use Defendant's calculation as Plaintiff's calculation had "rounding errors." The difference, however, is not significant.

price in July 2006. Between January 2007 and August 2008, Greenwich sold all of the lead, with the exception of preserving three ingots of lead, to third parties. In total, Greenwich received $3,228,956.91 when it resold the lead to third parties.

Greenwich estimates its total damages are approximately $813,375.77. After deducting the $369,644.83 Schlumberger paid in "net cash" to Greenwich for the July 2006 shipments, Greenwich estimates its net damages are approximately $443,730.94. Greenwich estimates the "loss on value of the material" as $218,921.59 and that is computed by the difference between the 13 cent premium it would have received from Schlumberger and the premium it actually received from third parties. In addition, Greenwich claims it incurred losses of $129,950.20 for "London Metal Exchange Backwardation Cost" when it rolled forward at three monthly intervals the hedge contracts it entered into with Amalgamated Metal Trading.

Plaintiff Schlumberger brought suit for breach of contract; breach of express warranty; breach of implied warranty of merchantability; and unjust enrichment. Defendant Greenwich counterclaimed alleging breach of contract. Defendant Greenwich now seeks partial summary judgment asserting that its Terms and Conditions control. Plaintiff seeks summary judgment on Defendant's counterclaim on the basis that Defendant has suffered no damages. In addition, Plaintiff seeks summary judgment concerning the applicability of its Terms and Conditions.

## II. Summary Judgment Standard

Summary judgment is appropriate if the moving party demonstrates that "there is no genuine issue as to any material fact" and that it is "entitled to judgment as a matter of law."[3] "An issue of

---

[3] Fed. R. Civ. P. 56(c).

fact is 'genuine' if the evidence allows a reasonable jury to resolve the issue either way."[4] A fact is "material" when "it is essential to the proper disposition of the claim."[5] The court must view the evidence and all reasonable inferences in the light most favorable to the nonmoving party.[6]

The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact.[7] In attempting to meet this standard, the moving party need not disprove the nonmoving party's claim; rather, the movant must simply point out the lack of evidence on an essential element of the nonmoving party's claim.[8]

If the moving party carries its initial burden, the party opposing summary judgment cannot rest on the pleadings but must bring forth "specific facts showing a genuine issue for trial."[9] The opposing party must "set forth specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant."[10] "To accomplish this, the facts must be identified by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein."[11] Conclusory allegations alone cannot defeat a properly supported motion for

---

[4] *Haynes v. Level 3 Communications*, LLC, 456 F.3d 1215, 1219 (10th Cir. 2006).

[5] *Id.*

[6] *LifeWise Master Funding v. Telebank*, 374 F.3d 917, 927 (10th Cir. 2004).

[7] *Thom v. Bristol-Myers Squibb Co.*, 353 F.3d 848, 851 (10th Cir. 2003)(citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)).

[8] *Id.* (citing *Celotex*, 477 U.S. at 325.)

[9] *Garrison v. Gambro, Inc.*, 428 F.3d 933, 935 (10th Cir. 2005).

[10] *Mitchell v. City of Moore, Okla.*, 218 F.3d 1190, 1197 (10th Cir. 2000)(citing *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998).

[11] *Adler*, 144 F.3d at 671.

summary judgment.[12] The nonmovant's "evidence, including testimony, must be based on more than mere speculation, conjecture, or surmise."[13]

Finally, summary judgment is not a "disfavored procedural shortcut," but it is an important procedure "designed to secure the just, speedy and inexpensive determination of every action."[14] Even though the parties have filed cross-motions for summary judgment, the legal standard does not change.[15] The Court must determine if there are any disputed material facts.[16] Each motion will be treated separately.[17]

## III. Analysis

Defendant asserts that it is entitled to partial summary judgment because its terms and conditions control the contract, while Plaintiff asserts that it is entitled to summary judgment because its terms and conditions are controlling. Plaintiff also asserts that it is entitled to summary judgment because Defendant has suffered no damages and therefore does not have a claim for breach of contract.

### *Choice of Law*

Plaintiff asserts that a choice of law analysis is necessary, and the Court should apply Kansas law to first determine whether Defendant's terms and conditions are part of the contract. Defendant contends that a choice of law analysis is unnecessary because the Uniform Commercial Code is to

---

[12] *White v. York Int'l Corp.*, 45 F.3d 357, 363 (10th Cir. 1995).

[13] *Bones v. Honeywell Intern, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004).

[14] *Celotex*, 477 U.S. at 327 (quoting Fed. R. Civ. P. 1).

[15] *City of Shawnee v. Argonaut Ins. Co.*, 546 F. Supp. 2d 1163, 1172 (D. Kan. 2008).

[16] *Atl. Richfield Co. v. Farm Credit Bank of Wichita*, 226 F.3d 1138, 1148 (10th Cir. 2000).

[17] *Id.*

be interpreted uniformly. Both parties rely on K.S.A. § 84-2-207, cases from Kansas and the District of Kansas, and cases from outside the state.

"In a diversity matter, the court must apply the substantive law of the forum state, including its choice of law provisions."[18] Kansas courts apply "the rule of *lex loci contractus* (the place the contract was made) in cases involving contract law."[19] "Matters bearing upon the execution, the interpretation and the validity of a contract are determined by the law of the place where the contract is made."[20]

The UCC is intended to be applied uniformly across the various states.[21] Generally, a choice of law analysis is unnecessary where there is no material difference between the applicable substantive law.[22] However, a choice of law analysis may be necessary when state law principles impact the interpretation of the substantive law.[23] The Court notes that the Tenth Circuit stated this proposition in finding that a district court erred in not first performing a choice of law analysis in interpreting UCC § 2-207.[24] The *Avedon* court noted that "[t]he first step in evaluating whether the

---

[18] *Lipari v. US Bancorp NA*, 2008 WL 4190784, at *2 (D. Kan. Sept. 4, 2008).

[19] *King v. Citizens Bank of Warrensburg*, 1990 WL 154210, at *3 (D. Kan. Sept. 19, 1990) (citations omitted); *see also Frasher v. Life Investors Ins. Co. of America*, 14 Kan. App. 2d 583, 585, 796 P.2d 1069, 1071 (1990) ("For choice of law purposes where the issue is contract construction, Kansas applied the rule of *lex loci contractus, i.e.*, the place of the making.").

[20] *King*, 1990 WL 154210, at *3 (citing *Sykes v. Bank*, 78 Kan. 688, 98 P. 206 (1908)). Although Plaintiff asserts that the Court should apply Kansas' choice of law provisions, it provides no argument nor analysis as to what law then applies to this contract action, but instead relies on the proposition that the Court should apply Kansas law in a diversity matter.

[21] *Scotwood Indus., Inc. v. Frank Miller & Sons, Inc.*, 435 F. Supp. 2d 1160, 1164 n. 3 (D. Kan. 2006) (citation omitted).

[22] *Avedon Eng'g, Inc. v. Seatex*, 126 F.3d 1279, 1284 (10th Cir. 1997).

[23] *Id.*

[24] *Id.* Similarly, in that case, one party argued that a choice of law analysis was unnecessary, and one party asserted that Colorado law should be applied. *Id.*

arbitration term was included in the [parties'] contract should be a determination of what state's law controlled the formation of that contract."[25] The parties have not identified any state law principles that differ or affect the interpretation of this contract under the UCC.[26] As stated above, both parties rely on cases from Kansas and outside of Kansas. As such, the Court will look primarily to the UCC and Kansas law in the interpretation of the formation of the contract but will also rely on decisions from other states when there is no relevant case law from Kansas.[27]

### *Terms and Conditions*

Defendant contends that the sales contracts it sent to Plaintiff were an offer, and Plaintiff's conforming purchase orders were its acceptance of Defendant's offer. Defendant's sales contracts contained its terms and conditions on the reverse side, while Plaintiff's purchase orders stated at the bottom its terms and conditions were incorporated by reference. The terms and conditions, however, were not provided to Defendant.

Plaintiff did not sign Defendant's sales contracts, and Defendant did not sign Plaintiff's purchase orders. Defendant, however, made its first delivery in July 2006. Defendant wants this Court to determine that the contract between the parties consisted of Defendant's sales contracts, including its terms and conditions, and Plaintiff's purchase orders, not including its terms and conditions.

Plaintiff contends that the parties reached an oral agreement on the phone prior to the exchange of the sales contracts and purchase orders. Plaintiff, therefore, contends that Defendant's

---

[25]*Id.*

[26]Neither party addresses the issue.

[27]*See Scotwood*, 435 F. Supp. 2d at 1164 n. 3 (citing *Nat'l Envtl. Serv. Co. v. Ronan Eng'g Co.*, 256 F.3d 995, 1004 (10th Cir. 2001)).

sales contracts and Plaintiff's purchase orders were mere offers to add terms to an existing agreement. Plaintiff asserts that the question of whether Defendant's or Plaintiff's terms and conditions became part of the contract depends on facts outside the summary judgment record, such as whether the terms materially altered the prior oral agreement and to what extent the parties' terms and conditions conflict. At the same time, Plaintiff contends that this Court should determine that its terms and conditions are controlling.[28]

K.S.A. § 84-2-207(1) and (2) provide:

(1) A definite and seasonable expression of acceptance or a written confirmation which is sent within a reasonable time operates as an acceptance even though it states terms additional to or different from those offered or agreed upon, unless acceptance is expressly made conditional on assent to the additional or different terms.

(2) The additional terms are to be construed as proposals for addition to the contract. Between merchants such terms become part of the contract unless:
(a) the offer expressly limits acceptance to the terms of the offer;
(b) they materially alter it; or
(c) notification of objection to them has already been given or is given within a reasonable time after notice of them is received.

Neither party addresses K.S.A. § 84-2-207(3) which provides "[c]onduct by both parties which recognizes the existence of a contract is sufficient to establish a contract for sale although the writings of the parties do not otherwise establish a contract. In such case the terms of the particular contract consist of those terms on which the writings of the parties agree, together with any supplementary terms incorporated under any other provisions of this act." Comment 7 provides "[i]n many cases, as where goods are shipped, accepted and paid for before any dispute arises, there is no question whether a contract has been made. In such cases, where the writings of the parties do

---

[28]Plaintiff offers the unusual argument that the Court should deny Defendant's motion for summary judgment because there are questions of fact as to whether the Terms and Conditions materially alter the contract while simultaneously asserting that the Court should determine as a matter of law in Plaintiff's favor that Plaintiff's Terms and Conditions are controlling.

not establish a contract, it is not necessary to determine which act or document constituted the offer and which the acceptance. See Section 2-204. The only question is what terms are included in the contract, and subsection (3) furnishes the governing rule." "The governing rule is that one party should not be able to impose its terms and conditions on the other simply because it fired the last shot in the battle of the forms."[29]

In this case, it is undisputed that the parties had an oral agreement. Peter Appleby, Defendant's owner, admitted during his deposition that the parties had reached an oral agreement over the telephone. The oral agreement included the price, delivery, and shipment.

Defendant then sent Plaintiff sales contracts and Plaintiff subsequently sent Defendant purchase orders. Plaintiff did not sign Defendant's contracts, and Defendant did not sign Plaintiff's purchase orders. Comment 2 to K.S.A. § 84-2-207 indicates that "[u]nder this Article, a proposed deal which in commercial understanding has in fact been closed is recognized as a contract. Therefore, any additional matter contained in the confirmation or in the acceptance falls within subsection (2) and must be regarded as a proposal for an added term unless the acceptance is made conditional on the acceptance of the additional or different term." The Tenth Circuit, in applying K.S.A. § 84-2-207, has stated that "provisions in the unsigned invoices not previously agreed upon or different from an earlier understanding constitute mere proposals for additions to the agreements under § 84-2-207(2)."[30] Therefore, to the extent that Defendant's sales contracts and Plaintiff's purchase orders contained additional terms, they must be construed as mere proposals.

---

[29]*Hua v. MEMC Elec. Materials, Inc.*, 2009 WL 1363545, at *6 (N.D. Cal. May 14, 2009).

[30]*Transamerica Oil Corp. v. Lynes, Inc.*, 723 F.2d 758, 765 (10th Cir. 1983).

These proposals become part of the contract unless "they materially alter it" or "notification of objection to them has already been given or is given within a reasonable time after notice of them is received."[31] "The issue of whether a term materially alters the contract for purposes of § 2-207(2)(b) is a question of fact that must be determined in light of the facts of the case and the parties' expectations."[32] With regard to the terms and conditions, both parties request the Court to determine as a matter of law that their terms and conditions are controlling. To determine whether the terms materially altered the contract, the Court would have to find as a matter of law that the terms were reasonable and would not alter the parties' duties.[33] Although both parties provide the Court with their terms and conditions, neither party specifically discusses the content of their terms and conditions nor provides the Court with any information as to how the terms and conditions materially alter the contract or even whether the terms are conflicting. The Court, therefore, has not been given sufficient information as to these terms and conditions. Furthermore, whether the terms materially alter the contract is a question of fact to be determined by the circumstances.

In addition, while Defendant argues that it expressly objected to Plaintiff's terms and therefore Plaintiff's terms and conditions cannot be incorporated, the objection that Defendant relies upon is contained in its terms and conditions. Paragraph one of Defendant's terms and conditions states "[s]eller hereby gives notice that it objects to any term or condition contained in any document or form supplied by Buyer to Seller which is in addition to or different from the terms of this Agreement." As the Court noted above, whether the terms and conditions are part of the contract

---

[31]K.S.A. § 84-2-207(2)(b) and (c). Although Defendant contends that there was no contract until it received Plaintiff's purchase orders, Defendant admitted that there was a verbal agreement on the phone.

[32]*Transamerica Oil*, 723 F.2d at 765; *see also Scotwood*, 435 F. Supp. 2d at 1165.

[33]*Scotwood*, 435 F. Supp. 2d at 1165-66.

is based on whether the terms and conditions materially altered the contract which is a question of fact. Therefore, with regard to this specific term, because the Court cannot determine as a matter of law whether Defendant's terms and conditions are part of the contract, it necessarily cannot determine whether a phrase in Defendant's terms and conditions is controlling and amounted to an objection to Plaintiff's terms.

Accordingly, the Court denies both Plaintiff's and Defendant's motions for summary judgment as to the issue of whose terms and conditions are applicable.

*Damages*

Plaintiff also contends that it is entitled to summary judgment on Defendant's counterclaim for breach of contract because Defendant has suffered no damages. "The elements to a breach of contract claim are (1) the existence of a binding contract; (2) defendant's breach of the contract; and (3) plaintiff's damages as a result of the breach."[34] Defendant also stated in the Pretrial Order that an essential element of its breach of contract claim included damages caused by Plaintiff's breach.

"The construction of a written instrument is a question of law . . . . Whether an ambiguity exists in a written instrument is a question of law to be decided by the court."[35] "The Kansas Supreme Court has interpreted K.S.A. § 84-2-202 as meaning that parol evidence is to be used only when the agreement is ambiguous, or silent on a matter. As a general rule, if the language is clear, there is no room for rules of construction."[36] "[C]ourts should not strain to create an ambiguity

---

[34]*Rigid Steel Structures, Inc. v. Mesco Metal Bldgs. Inc.*, 1992 WL 53754, at *5 (D. Kan. Feb. 26, 1992).

[35]*Catholic Diocese of Dodge City v. Raymer*, 251 Kan. 689, 691, 840 P.2d 456, 458 (1992).

[36]*Tri-State Commodities, Inc. v. GSO America, Inc.*, 18 Fed. Appx. 737, 742 (10th Cir. 2001) (citing *Barbara Oil Co. v. Kansas Gas & Elec. Co.*, 250 Kan. 438, 827 P.2d 24, 34 (1992) and *Marquis v. State Farm Fire & Cas. Co.*, 265 Kan. 317, 961 P.2d 1213, 1219 (1998)).

-14-

where, in common sense, there is none."[37]

The parties first reached an oral agreement which included the price, delivery, and shipment. Defendant then sent its written sales contract which stated:

> Average LME lead cash settlement for July, 2006 plus premium of 13 cents/lb.
> Shipment: July 2006
> Pricing: Average LME lead cash settlement for August, 2006 plus premium of 13 cents/lb.
> Shipment: August 2006
> Pricing: Average LME lead cash settlement for September, 2006 plus premium of 13 cents/lb.
> Shipment: September 2006

Plaintiff's subsequent written purchase orders contained an almost verbatim price:

> Pricing on purchase order is an estimate. It will be based on the LME average cash settlement for July plus $0.13/lb. premium.
> Pricing on purchase order is an estimate. It will be based on the LME average cash settlement for August plus $0.13/lb. premium.
> Pricing on purchase order is an estimate. It will be based on the LME average cash settlement for September plus $0.13/lb. premium.

Defendant now contends that the parties did not mean the actual months of July, August, and September, but the parties instead meant the month that the lead was actually shipped.[38] The Court cannot find any ambiguity in the price term or the scheduled month of delivery. The terms regarding lead pricing and shipment in both Defendant's sales contracts and Plaintiff's purchase orders clearly state that the lead would be delivered to Plaintiff in July, August, and September. They also unambiguously provide that pricing would be determined by the LME average cash settlement for

---

[37]*First Fin. Ins. Co. v. Bugg*, 265 Kan. 690, 694, 962 P.2d 515, 519 (1998).

[38]Ironically, Defendant relies on its initial email it sent to Plaintiff in which it states for price "LME cash settlement price for lead averaged during the month of scheduled shipment plus a premium of 13 ¢lb." However, the email also states that shipment was to occur "20 truckloads per month, July through September, 2006."

the months of July, August, and September.

The cash settlement price for lead on the LME was: $1,052.38 per metric ton in July, 2006; $1,174.14 per metric ton in August, 2006; and $1,342.38 per metric ton in September, 2006. Plaintiff was supposed to receive 400 metric tons each month and was going to pay an additional 13 cents per pound resulting in an additional $114,640.34 each month. Because there is no ambiguity as to the price and scheduled month of shipment, the Court finds that the total contract price between Plaintiff and Defendant was $1,771,481.02.[39]

Plaintiff paid Defendant $429,129.60 for the first delivery of lead. Defendant reclaimed most of the lead and sold it and the lead from two other scheduled deliveries to third parties. Defendant did not return the money previously paid by Plaintiff. Beginning in September 2006, the price of lead began to increase substantially. When Defendant resold the lead to third parties, Defendant received $3,228,956.91. This is $1,457,475.89 more than the original contract price.

Defendant's estimate of damages indicate that its total damages are approximately $813,375.77. It arrived at this tabulation:

---

[39]K.S.A. § 84-2-202 provides "[t]erms with respect to which the confirmatory memoranda of the parties agree or which are otherwise set forth in a writing intended by the parties as a final expression of their agreement with respect to such terms as are included therein may not be contradicted by evidence of any prior agreement or of a contemporaneous oral agreement but they may be explained or supplemented (a) by course of performance . . . ." Here, the parties' course of performance also demonstrates the intent of the parties. The parties agreed that lead would be delivered in July, August, and September. Some of the lead scheduled for July was not delivered to Plaintiff until August 2006. Defendant invoiced Plaintiff for the July shipment and August shipment of the July lead at the July LME price. Accordingly, the Court finds that the parties' course of performance supports the plain meaning of the pricing language.

| Loss on material[40] | $218,921.59 |
|---|---|
| Storage | $44,049.60 |
| Handling | $1,450.00 |
| Trucking | $29,611.72 |
| Financing | $393,392.66 |
| LME Backwardation | $125,950.20 |
| **Total** | **$813,275.77** |

After deducting the net cash paid by Schlumberger of $369,644.83 for the July 2006 shipment,[41] Greenwich states that its net damages are approximately $443,730.94.

"The usual remedy for breach of a sales contract will be the recovery of damages under either § 84-2-706 or § 84-2-708, recovering on either the difference between resale price and contract price or the difference between contract price and market price at the time and place of tender."[42] K.S.A. § 84-2-706 governs resale and provides:

> Under the conditions stated in section 84-2-703 on seller's remedies, the seller may resell the goods concerned or the undelivered balance thereof. Where the resale is made in good faith and in a commercially reasonable manner the seller may recover the difference between the resale price and the contract price together with any incidental damages allowed under the provisions of this article (section 84-2-710), but less expenses saved in consequence of the buyer's breach.

---

[40]Defendant contends this "loss of profit" is due to the difference between the 13 cent premium it would have received from Plaintiff above the LME cash settlement price and the premium it actually received from third parties above the LME cash settlement price.

[41]Schlumberger paid $429,129.60 for the July shipment. Greenwich subtracted $57,290.58 for the 94,321 pounds of material Schlumberger used and subtracted $2,194.25 for an invoice correction to come up with the net cash paid of $369,644,83.

[42]*Sharp Elec. Corp. v. Lodgistix, Inc.*, 802 F. Supp. 370, 377 (D. Kan. 1992).

In this case, the difference between the resale price and the contract price is in Defendant's favor, so there is no difference between the resale price and the contract price for Defendant to recover. While Defendant contends that the LME price on any given month is irrelevant and the appropriate measure of damages is the difference in the premium that Plaintiff was going to pay and the lower premium the third parties paid, this defies common sense. The LME cash settlement price is relevant, and the parties set forth the scheduled months for shipment in July, August, and September. The parties also set forth the price as the LME cash settlement price in those months. Due to Plaintiff's alleged breach in rejecting the lead, Defendant made an additional $1.5 million that it would not have made absent Plaintiff's rejection of the lead.

In addition, although Defendant is entitled to recover its expenses in selling the goods as incidental damages, Defendant has already recovered its expenses. As stated above, Defendant received $3,228,956.91 when it sold the lead to third parties. This is $1,457,475.89 more than the original contract price and $1,013,744.95 more than the original contract price together with Defendant's incidental damages. To allow Defendant's recovery of an additional $443,730.94 would only increase Defendant's profit. It certainly would not compensate Defendant for damages, and Defendant has been made more than whole. Because Defendant has suffered no damages and lacks an essential element of its claim, Plaintiff is entitled to summary judgment on Defendant's counterclaim.

**IT IS ACCORDINGLY ORDERED** this 30th day of December, 2009 that Defendant's Partial Motion for Summary Judgment (Doc. 69) is hereby denied.

**IT IS FURTHER ORDERED** that Plaintiff's Motion for Summary Judgment (Doc. 102) is granted in part and denied in part. It is denied to the extent that the Court finds there is an issue of fact as to whose terms and conditions are controlling. It is granted in part that Defendant has not sustained any damages and therefore has no counterclaim for breach of contract.

**IT IS SO ORDERED.**

s/Eric F. Melgren  
ERIC F. MELGREN  
UNITED STATES DISTRICT JUDGE