# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF KANSAS

SCHLUMBERGER TECHNOLOGY
CORPORATION,

        *Plaintiff*,

vs.                                         Case No. 07-2252-EFM

GREENWICH METALS, INC.,

        *Defendant.*

## MEMORANDUM AND ORDER

Plaintiff Schlumberger Technology Corporation ("Schlumberger") and Defendant Greenwich Metals, Inc. ("Greenwich") contracted for the sale of 1,200 metric tons of lead. After Schlumberger received the first shipment, it experienced problems in its production line. Schlumberger ultimately rejected the lead, and Greenwich retrieved the lead already delivered and did not deliver any more lead.

Schlumberger brings suit alleging that Greenwich failed to refund the money Schlumberger paid for the defective lead. Greenwich counterclaims alleging that Schlumberger wrongfully rejected the lead. Before the Court is Defendant Greenwich's Motion for Sanctions (Doc.104) and Plaintiff Schlumberger's Motion for Sanctions (Doc. 111). The motions have been fully briefed. For the following reasons, the Court denies Defendant Greenwich's motion and deems moot in part and reserves ruling in part Plaintiff Schlumberger's motion.

## I. Factual Background

Plaintiff and Defendant entered into a contract for the sale of copperized lead. Defendant contracted with a third party mining company, Xstrata (formerly known as Falconbridge or Noranda). Xstrata produced the lead in ten different batches or "lots." Defendant was required to provide samples of the lead for Plaintiff to test prior to approving delivery. In June of 2006, Defendant forwarded to Plaintiff three samples of lead from Lot 6308. Plaintiff did not receive samples from any of the other nine lots.

After receiving the samples, Plaintiff tested them to determine their chemical composition. Plaintiff sent two samples to Doe Run Company and received the results on or about July 13, 2006. The results showed the samples' chemical composition appeared to be within the ranges of the chemicals identified in Plaintiff's procurement specifications. Plaintiff told Defendant that the test results from the samples had come back "okay."

Beginning in late July, 2006, Defendant began delivering the majority of the July lead shipments. All of the lead Defendant delivered came from four lots, Lots 6313, 6319, 6321, and 6325. None of the lead came from the sample lot, Lot 6308. Shortly after Plaintiff began using the lead, it experienced problems in its production line. Plaintiff notified Defendant and instructed it to stop all deliveries. Plaintiff rejected the lead sometime between November and January, and Defendant retrieved the lead in November or December 2006.

*Plaintiff's Untimely Production of Two Emails*

Plaintiff filed its lawsuit on June 12, 2007 alleging breach of contract; breach of express warranty; breach of implied warranty of merchantability; and unjust enrichment. Defendant filed a counterclaim alleging breach of contract. Pursuant to its Rule 26(a)(1) disclosures, on November

21, 2007, Plaintiff produced the actual test results from Doe Run regarding the lead samples and an email exchange occurring on July 13, 2007 and July 21, 2007 between Melissa Ver Meer, Plaintiff's metallurgist, and Greg Hinson from the Doe Run Company.

Defendant served its first document requests on December 13, 2007 and requested all of Plaintiff's documents concerning or relating to the facts and circumstances of the litigation exchanged between Plaintiff and any persons other than Defendant.[1] Plaintiff responded on January 15, 2008 making numerous objections and stating that "all non-privileged responsive documents have been and/or will be produced."

On February 27, 2009, Defendant served a second set of document request and requests for admissions. One request for admission asked Plaintiff to admit that the lead samples it received from Falconbridge, now know as Xstrata, complied with the Schlumberger Procurement Specification, attached as Exhibit A. On April 13, 2009, Plaintiff objected to the request and denied the request.[2]

Plaintiff also produced documents responsive to Defendant's Second Request for Production of Documents on April 13, 2009. Previously, on January 29, 2009, Defendant deposed Debby Roberts, Schlumberger's Procurement Specialist, who ordered the lead. After Roberts' deposition, she conducted another search for any documents related to Defendant and the issues in this case. During Roberts' search, she apparently found a folder of documents filed under "Noranda," the other name for Xstrata. Roberts then provided the documents to Plaintiff's counsel, and they were

---

[1] This is merely a summary of Defendant's four specific requests for production.

[2] Plaintiff's objection noted that the exhibit was not attached to the request. In addition, Plaintiff contends that the Procurement Specification incorporates Plaintiff's "workmanship requirements" which can only be determined by using the lead in the manufacturing process.

-3-

included in the documents that Plaintiff produced.[3]

Two emails that had not been previously produced were included in the documents. One email is a July 21, 2006 email from Melissa Ver Merr to certain employees at Schlumberger that states:

> I'm forwarding the lab samples that we're tested from Falconbridge/Noranda via Greenwich Metals. They look relatively good, Bismuth is a little higher than I'd like but in spec. So Falconbridge lead is approved for use. However, I'd like to take samples off the line when its running and I would recommend isolating it to one lead extruder as a precaution.

This specific email from Ver Merr was the last exchange at the end of an email string between Ver Merr and Hinson that Plaintiff had previously produced.

The other email is a March 7, 2007 email from Debby Roberts to an individual at Doe Run in which she states:

> I am inquiring about the possibility of Doe Run reprocessing more lead for us. To make a long story short we purchased lead from a Canadian supplier in early June of last year. We had the material tested and it met our specifications however, we are having trouble processing the material. The supplier refuses to take back the material, so we are trying to work out something amicable with them like buying the material and having it reprocessed.

*Defendant's Lead Disposal*

In January 2007, prior to this lawsuit being filed, Defendant began selling the lead to third parties and shipping it from Wagner Industries, the Kansas City warehouse where the lead was stored. After litigation had been proceeding for approximately nine months, in March 2008,

---

[3]On July 13, 2009, Plaintiff again supplemented its disclosures. According to Plaintiff's counsel's affidavit, Mr. Brian Baggot performed a review of the firm's case files after Defendant filed its motion. In searching the firm's case files, Mr. Baggot discovered an email from Schlumberger in February 2008 indicating that Schlumberger had forwarded a CD containing the results of a word search. Mr. Baggot states that the CD had been placed in the file but mistakenly never inspected or reviewed. This CD contained approximately 75 pages of responsive, non-privileged documents, including strings of email correspondence that had already been produced in the case. One of the emails is the subject of Defendant's motion.

Defendant had roughly 600 metric tons of lead in its possession, including samples from three of the Lots from which Plaintiff had received lead.[4] Defendant retained Kevin Tucker of Alfred H. Knight North America, Ltd., a commodities testing company, to serve as an expert in this case in March 2008. By August 2008, Defendant had disposed of all of the lead from the four Lots Plaintiff had originally received and only had lead remaining from Lots 6308,[5] 6310, and 6329.

In August 2008, Defendant's expert, Tucker, drilled samples from the three Lots that were available for testing. He drilled samples from at least sixteen ingots.[6] The drilled samples were combined to form a representative samples from each Lot and served as the basis for Tucker's tests. After the tests were performed, Defendant retained one ingot from each Lot, and Defendant's expert retained approximately five pounds of representative lead samples.

*Defendant's Production of Documents Relating to the Sale of the Lead*

Plaintiff served its first set of document requests on November 9, 2007 and requested all of Defendant's documents concerning or relating to the selling or marketing of the lead at issue.[7] Defendant produced documents responsive to the requests in December 2007. On December 9, 2008, Defendant produced a second set of documents related to the resale of the lead. These documents did not include, as they had before, bills of lading, correspondence, and packing lists reflecting how the lead was selected to be sold to third parties. On March 3, 2009, Plaintiff served a document subpoena on Wagner Industries, the place where the lead had been stored, seeking bills

---

[4] It is unclear to the Court when the lead from Lot 6325, the lead that Plaintiff was using at the time the problems began, was disposed of by Defendant, but it appears to be earlier than March 2008.

[5] Lot 6308 was the lot from which Plaintiff received its original sample in June of 2006.

[6] An ingot is a mass of metal. There were six ingots from Lot 6310 and five ingots each from Lots 6308 and 6329.

[7] This is a summary of Plaintiff's three specific requests for production.

of lading, packing lists, and correspondence regarding the sale of lead. Wagner produced over 700 pages of material.

Both Defendant and Plaintiff bring motions for sanctions. Defendant asserts that Plaintiff's conduct of untimely producing two emails warrants dismissal of the complaint. Plaintiff states that Defendant's conduct of disposing of all the lead warrants either: (1) dismissal of Defendant's counterclaim; (2) an adverse inference instruction at trial; or (3) the exclusion of Defendant's expert and his report. Plaintiff also contends that Defendant's failure to produce documents showing that it knew from which Lots it was selling the lead warrants the striking of Defendant's damages claim directly related to its resale of the lead

## II. Analysis

"[D]ismissal of an action with prejudice is a drastic sanction that should be employed only as a last result."[8] There are five factors to consider when determining whether the sanction of dismissal is appropriate:

> (1) the degree of actual prejudice to the defendant; (2) the amount of interference with the judicial process; (3) the culpability of the litigant; (4) whether the court warned the party in advance that dismissal of the action would be a likely sanction for noncompliance; and (5) the efficacy of lesser sanctions.[9]

"It is only when the aggravating factors outweigh the judicial system's strong predisposition to resolve cases on their merits that dismissal is an appropriate sanction."[10]

### *1. Defendant Greenwich's Motion for Sanctions*

Defendant requested documents relating to the facts and circumstances of the litigation and

---

[8]*Davis v. Miller*, 571 F.3d 1058, 1061 (10th Cir. 2009).

[9]*Id.* (citing *Ehrenhaus v. Reynolds*, 965 F.2d 916, 921 (10th Cir. 1992)).

[10]*Id.* (internal citations and quotations omitted).

requested Plaintiff to admit that the lead sample complied with Plaintiff's procurement specification. In January 2008, Plaintiff stated that it had produced all documents. On February 27, 2009, Defendant served a second set of document request and requests for admissions. In April 2009, Plaintiff refused to admit that the lead sample it received from Falconbridge, now know as Xstrata, complied with Plaintiff's specifications. Plaintiff also produced additional documents, including two emails, pursuant to Defendant's second request for production. These two emails essentially state that the sample lead met Plaintiff's specifications.

Defendant contends that Plaintiff's refusal to timely produce these two emails is deserving of the extreme sanction of striking Plaintiff's complaint. While Defendant asserts that the two emails are an unequivocal admission that the lead at issue in this case met Plaintiff's specifications, the Court cannot so find. These two emails reference the sample lead that Defendant provided from one Lot in June 2006 and do not reference the lead that Plaintiff actually received from Defendant from four different lots.[11] The emails, however, do state that the sample lead met Plaintiff's specifications.

Defendant has not satisfied any of the factors that would warrant dismissal. First, Defendant has not been prejudiced by the late disclosure. Plaintiff voluntarily produced the two emails, although with documents responsive to Defendant's second request for production of documents, without court intervention. Defendant questioned Plaintiff's corporate representatives about these two emails. While Defendant contends that the production of these emails earlier in litigation would have made for a less expensive course of discovery, the Court is unclear as to what costs would have

---

[11]The Court finds it conceivable that lead from one lot may be different from lead from another lot. While this may not be the case, this appears to be an issue that is better left for the trier of fact to determine after all evidence has been adduced at trial.

been saved when the lead that was delivered to Plaintiff would still be at issue.[12] In addition, Defendant's contention that the lead met Plaintiff's procurement specifications, and therefore Plaintiff has no valid claim for a return of the money it paid to Defendant because the delivered lead was exactly what Plaintiff requested appears to be erroneous. As stated above, the Court finds that there may be an issue as to whether the lead that was delivered to Plaintiff met Plaintiff's procurement specifications.

Second, the interference with the judicial process is slight. The sum of Defendant's argument is that Plaintiff has interfered with the judicial process because Plaintiff does not have a case because the lead delivered to it was exactly what Plaintiff requested and with the late disclosure of emails, Plaintiff cannot be trusted that it has properly disclosed all documents. Again, the fact that the sample lead met Plaintiff's specifications does not necessarily indicate that the delivered lead met Plaintiff's specifications. Defendant's assertion that Plaintiff cannot be trusted does not constitute interference with the judicial process.

Third, the culpability of the litigant is questionable. Defendant contends that Plaintiff's conduct was wilful and intentional, but Plaintiff has provided signed affidavits by both Plaintiff's corporate representative and Plaintiff's counsel stating that the omission was a mere oversight. Although the Court finds it curious that the July 21, 2007 email ultimately produced had previously been produced without the last strand of the message stating that lead was "in spec," it cannot go so far to find that Plaintiff's conduct was intentional, particularly because Plaintiff has provided signed affidavits with a reasonable explanation as to how the email was undiscovered. In any event,

---

[12]While Defendant asserts that it hired an expert to test the lead because Plaintiff would not admit that the lead met Plaintiff's specifications, Defendant hired the expert in March 2008, tested the lead in August 2008, and provided the expert report on February 13, 2009. This all occurred before Defendant served Plaintiff with its Requests for Admissions on February 27, 2009.

Plaintiff voluntarily produced the email exchange with its second set of documents. This factor weighs only slightly in Defendant's favor.

Fourth, Plaintiff has never been warned in advance that dismissal was a likely sanction for noncompliance because there was no previous non-compliance nor any requests to the Court regarding Plaintiff's conduct. Indeed, as stated above, Plaintiff produced the emails voluntarily.

Finally, a lesser sanction would be more appropriate than the striking of Plaintiff's pleadings. Defendant did not request a lesser sanction, and the Court declines to propose one. Because Defendant has failed to demonstrate factors warranting the extreme sanction of dismissal, Defendant's motion for striking the pleadings is denied.

### *2. Plaintiff Schlumberger's Motion for Sanctions*

Plaintiff argues that this is a classic case of spoliation of evidence because Defendant systematically disposed of nearly every piece of lead at issue, even lead its own expert tested, and retained only three pieces from lead Plaintiff never received or used. Plaintiff asserts that Defendant's disposal of all of the lead that may be at issue in the case warrants either: (1) dismissal of Defendant's counterclaim; (2) an adverse inference instruction at trial; or (3) the exclusion of Defendant's expert and his report. In addition, Plaintiff argues that Defendant's failure to produce documents relating to its resale of lead warrants the sanction of striking Defendant's damages claim.

### *A. Spoliation*

It is within the Court's discretion to impose sanctions for the spoliation of evidence.[13] In deciding the sanction, the Court "has discretion to fashion an appropriate remedy depending on the culpability of the responsible party and whether the evidence was relevant to proof of an issue at

---

[13] *Estate of Trentadue v. United States*, 397 F.3d 840, 862 (10th Cir. 2005).

trial."[14] The appropriate sanction "should be exercised with the view toward choosing the 'least onerous sanction corresponding to the willfulness of the destructive act and the prejudice suffered by the victim.'"[15] Sanctions that may be appropriate include: "(1) outright dismissal of claims; (2) exclusion of countervailing evidence; or (3) a jury instruction on the spoliation inference, which permits the jury to assume that destroyed evidence would have been unfavorable to the position of the offending party."[16]

"A spoliation sanction is proper where (1) a party has a duty to preserve evidence because it knew, or should have known, that litigation was imminent, and (2) the adverse party was prejudiced by the destruction of the evidence."[17] The court considers two primary factors: "(1) the degree of culpability of the party who lost or destroyed the evidence; and (2) the degree of actual prejudice to the other party."[18] The Court will address each factor.

*Degree of Culpability*

"A litigant has a duty to preserve evidence that it knows or should know is relevant to imminent or ongoing litigation."[19] "Such preservation may not be 'selective,' saving only the evidence supporting a theory of liability and impeding the examination of another theory."[20] The

---

[14]*Id.* at 862-63 (citing *Aramburu v. Boeing* Co., 112 F.3d 1398, 1407 (10th Cir. 1997)).

[15]*Workman v. AB Electrolux Corp.*, 2005 WL 1896246, at *5 (D. Kan. Aug. 8, 2005) (citing *Schmid v. Milwaukee Elec. Tool Corp.*, 13 F.3d 76, 79 (3d Cir. 1994)).

[16]*Id.*

[17]*Henning v. Union Pac. R.R. Co.*, 530 F.3d 1206, 1220 (10th Cir. 2008) (citation omitted).

[18]*Workman*, 2005 WL 1896246, at *5.

[19]*Id.* (citations omitted).

[20]*Id.* (citation omitted).

relevant time frame in this case to determine whether Defendant had a duty to preserve evidence is after Plaintiff filed suit. Prior to the lawsuit, it appears that the parties were attempting to reach a resolution with regard to the lead.[21]

Plaintiff filed suit on June 12, 2007. In its complaint, Plaintiff alleged, among other things, that the lead delivered in July and August 2006 was defective. Plaintiff sought the return of the money it had already paid Defendant for the allegedly defective lead. Defendant counterclaimed in July 2007 alleging that the lead was not defective and that Plaintiff had breached the contract.

The facts given for this motion indicate that the lead was produced in ten different lots, and Plaintiff received a sample from one lot in June 2006. After Plaintiff determined that the lead tested "okay," it received lead in July and August 2006 from four different lots. Plaintiff experienced problems in its production line after introducing the lead to its system.

In March 2008, approximately nine months after the lawsuit was filed and at the time Defendant retained its expert, Defendant had roughly 600 metric tons of lead in its possession, including samples from three of the lots from which Plaintiff had received lead.[22] Approximately five months later in August 2008 when Defendant's expert began testing the composition of the lead, there was lead remaining from three of the ten lots, and none of the lead was from the lots that Plaintiff had received. Defendant's expert drilled samples from sixteen ingots. Defendant then disposed of thirteen of the sixteen ingots and retained only three ingots.

---

[21]Plaintiff asserts that Defendant embarked on an inexplicable campaign to sell the lead as quickly as possible beginning in January 2007. As noted above, in January 2007, it appears that the parties were attempting to resolve their issues and therefore, litigation did not appear imminent.

[22]Neither party states when the lead from Lot 6325, the lead that Plaintiff was using at the time it experienced problems, was disposed of by Defendant.

Defendant argues that Plaintiff was the party that held the information of which specific heats of lead allegedly caused problems in Plaintiff's manufacturing process, and Plaintiff had the obligation to timely raise the issue to ensure preservation of the evidence which it failed to do. This argument, however, makes little sense because it appears that the whole of the lead is at issue. Indeed, as Plaintiff has noted, Defendant argues that Plaintiff's rejection of the lead places the chemical composition of the whole of the lead, not just that of specific ingots or heat, relevant to this case. If the whole of the lead is relevant, it appears to increase Defendant's need for preserving at least a small sample from each lot, and the Court is unclear as to why Defendant did not do so.

At the time litigation began, it appears that there was lead available from at least six lots.[23] At the time Defendant hired its expert, there was lead available from three of the four lots that Defendant had delivered to Plaintiff. At the time of testing, there was only lead available from three lots, and no lead remained from the lots that had been delivered to Plaintiff. Defendant's expert tested lead from sixteen ingots. After testing, Defendant disposed of thirteen of those sixteen ingots and retained three ingots from three different lots.

Defendant offers no explanation as to why it disposed of most of the lead except that it was part of its mitigation of damages. The Court finds that Defendants should have known that the lead, particularly the lead that was actually delivered to Plaintiff, would be relevant to this case in which Plaintiff alleged that Defendant supplied defective lead in July and August of 2006. The fact that Defendant should have known the importance and relevance of the lead is further illustrated in Defendant's motion for sanctions against Plaintiff. In Defendant's briefing, Defendant asserts that "[t]he key issue in this matter is whether lead sold by Greenwich Metals, Inc. to Schlumberger

---

[23]The Court has not been given information when the lead was disposed with regard to the four other lots.

Technology Corporation met Schlumberger's procurement specification for the lead. Schlumberger alleges that the lead was defective. Greenwich alleges that it met Schlumberger's procurement specifications." In addition, Defendant should have known that after testing sixteen ingots, Plaintiff was entitled to perform its tests on those ingots. Yet, Defendant disposed of thirteen ingots. Defendant had a duty to preserve some of the lead until Plaintiff could examine it.

*Amount of Prejudice*

Plaintiff asserts that it is significantly prejudiced by Defendant's disposal of the lead because Defendant has disposed of some of the evidence it intends to use at trial. In addition, Plaintiff contends that with regard to Defendant's counterclaim that the lead was not defective, Plaintiff cannot appropriately respond because Defendant has sold every piece of lead Plaintiff used and received. Defendant argues that sanctions are not appropriate because Plaintiff has (1) already tested the lead; (2) representative samples of the lead remain available for testing; (3) Plaintiff made no effort to preserve or inspect the lead; (4) samples from all heats may still exist.

In arguing that Plaintiff has already tested the lead and that representative samples of lead remain for testing, Defendant relies on Plaintiff's testing of the lead delivered in June 2006, Plaintiff's sending of fourteen samples to Xstrata, and Plaintiff's testing of the three ingots that Defendant retained. Defendant also argues that Plaintiff should have preserved the lead when the problems began. As stated above, the lead delivered in June 2006 and the lead delivered in July and August 2006 came from different Lots. Presumably, there could be a difference in the lead that Plaintiff originally tested and the lead it ultimately received. While the Court agrees with Defendant that Plaintiff's testing of the lead in June 2006 prior to the lawsuit being filed is not invalid, it still does not address that Plaintiff was not able to test the lead that was delivered. In addition, while

-13-

Plaintiff likely should have retained a sample of the allegedly defective lead when the problems began, it appears that the parties were working amicably at that time to resolve the issue.

With regard to Defendant's contention that Plaintiff sent fourteen samples away for testing after experiencing problems, this is not supported by the record. Finally, with regard to the three ingots that Plaintiff was able to test, as stated above, Plaintiff was entitled to test the same ingots that Defendant's expert tested. In addition, the lead that was actually delivered appears to be the most relevant. Defendant argues that it is either irrelevant or incorrect that there is no lead available for testing from the heat of lead Plaintiff introduced into its manufacturing process because the whole of the lead is at question. The Court fails to see how it is irrelevant because if the whole of the lead is at question, the lead that was actually delivered would certainly be relevant.

Defendant argues that even if there is some level of prejudice, Plaintiff brought the prejudice upon itself for neglecting to make any effort to sample and test the lead when it knew Defendant intended to sell the lead to third parties. As Plaintiff notes, Defendant's preservation duty extends throughout the case and the fact that Plaintiff did not request to inspect or sample the lead at the start of litigation does not give Defendant the ability to dispose of evidence. Although Plaintiff was aware that Defendant was selling the lead to mitigate its damages, Defendant's retention of one ingot from each Lot would not have been unreasonable. "While the scope of the duty to preserve evidence is not boundless, at a minimum, an opportunity for inspection should be afforded a potentially responsible party before relevant evidence is destroyed."[24]

---

[24] *Benton v. Dlorah, Inc.*, 2007 WL 3231431, at *4 (D. Kan. Oct. 30, 2007).

Defendant's last argument is that samples from all heats may still exist with the third party contractor, Xstrata, who is not a party to this case. Defendant states that the prejudice may be reversible if the Court opens up discovery to permit a deposition of Xstrata to determine if they retained samples of all ten lead heats. The Court has already prohibited the deposition of Xstrata by entering a Protective Order on May 21, 2009.[25] The Court declines to open discovery based on a hearsay statement from Xstrata's counsel to Defendant's counsel on the slim possibility that Xstrata *may* have retained lead samples.

Plaintiff's pursuit of its claim has been hampered by the disposal of most of the lead, in particular, the lead that was actually delivered to Plaintiff. The adequacy of the lead appears to be an issue in Plaintiff's case. Because no tests can be performed on seven of the Lots of the lead, including the four Lots that were actually delivered to Plaintiff, Plaintiff has been prejudiced in pursuing its claim.

*Appropriate Sanction*

Plaintiff requests three potential sanctions for Defendant's spoliation of evidence. These include: (1) dismissal of Defendant's counterclaim; (2) striking of Defendant's expert and his report; or (3) an adverse-inference instruction at trial about Defendant's conduct. It is within the court's discretion to determine the appropriate sanction. Before a litigant is entitled to a spoliation instruction, *i.e.*, an adverse-inference instruction, there must be evidence of intentional destruction

---

[25]Doc. 96. The Court noted that because Xstrata had indicated an unwillingness to answer Plaintiff's questions and there was no legal procedure in place to compel answers, Plaintiff should not be required to waste its time and resources traveling to Canada for the deposition. In addition, as the Court noted, Defendant and Xstrata share a common interest in establishing that the lead complied with the contract.

or bad faith.[26] This is because an adverse inference instruction is a powerful sanction."[27] The Tenth Circuit, however, does not have a similar requirement of bad faith for other spoliation sanctions.[28]

Plaintiff's request for dismissal of Defendant's counterclaim as a sanction is moot as the Court recently granted Plaintiff's motion for summary judgment on Defendant's counterclaim on other grounds. Plaintiff also asserts that an appropriate sanction would be to strike Defendant's expert and expert report or to give an adverse-inference instruction at trial. With regard to an adverse inference instruction, there must be evidence of intentional destruction or bad faith before the Court will give the instruction. Based on the current record, the Court will reserve ruling on whether to strike the expert and his report or to give an adverse-inference instruction at trial after hearing any relevant evidence and further argument by counsel.

The Court hereby sets a hearing for January 25, 2010 at 1:30 p.m. in Courtroom 440, Kansas City, Kansas Federal Courthouse. The Court will hear any relevant evidence and arguments from both Plaintiff and Defendant as to whether the striking of the expert report is warranted or whether Defendant acted in bad faith and an adverse-inference instruction is appropriate. In addition, the Court will address Plaintiff's request for attorneys' fees at this hearing and directs Plaintiff to file a brief demonstrating why it is entitled to attorneys' fees and costs on or before January 15, 2010 with Defendant filing any response to Plaintiff's brief on or before January 22, 2010. No reply will be allowed.

---

[26]*Henning*, 530 F.3d at 1220.

[27]*Id.* at 1219-20.

[28]*103 Investors I, L.P. v. Square D Co.*, 470 F.3d 985, 988 (10th Cir. 2006).

Accordingly, the Court reserves ruling on the adverse inference instruction and exclusion of expert testimony until after hearing further argument by counsel.[29]

**IT IS ACCORDINGLY ORDERED** this 31st day of December, 2009 that Defendant Greenwich's Motion for Sanctions (Doc.104) is hereby denied.

**IT IS FURTHER ORDERED** that Plaintiff Schlumberger's Motion for Sanctions (Doc. 111) is hereby deemed moot in part, and the Court reserves its ruling until a later date with regard to whether the sanction of striking Defendant's expert and expert report or the sanction of giving an adverse inference instruction is appropriate.

**IT IS SO ORDERED.**

> s/Eric F. Melgren
> ERIC F. MELGREN
> UNITED STATES DISTRICT JUDGE

---

[29]Plaintiff also argued that Defendant's failure to produce documents relating to the sale of lead warranted the sanction of striking Defendant's damages claim in its counterclaim. Because the Court recently granted Plaintiff's motion for summary judgment on Defendant's counterclaim, this point is moot and the Court declines to address the issue.